STATE OF MAINE
PENOBSCOT, ss.

SUPERIOR COURT
CIVIL ACTION
DOCKET NO. CV-10-29
*kMC - PEN - 9/27 301*


DALE ST. LOUIS and
THERESA ST. LOUIS,

        Plaintiffs


v.


WILKINSON LAW OFFICES, P.C., and
STEPHEN JORDAN, LLC, d/b/a
NORTHSTAR MORTGAGE,

        Defendants.


## DECISION AND ORDER

This matter was tried to the Court, without jury, on
September 22, 2011. Attorney Charles Gilbert, Esq.,
represented plaintiffs. Attorney James Bowie, Esq.,
represented defendant Wilkinson Law Offices. Defendant
Stephen Jordan, LLC, d/b/a Northstar Mortgage
("Northstar"), was represented by attorney Anthony Trask,
Esq.

## Facts

Upon review of the testimony and exhibits, the Court
finds the following facts:

1.   Jason Adamo worked as a mortgage broker, agent
     and employee of Northstar, the principal of which
     was Stephen Jordan, LLC.
2.   In 2007, Mr. Adamo contacted plaintiff Dale St.
     Louis seeking to help him find funding for his
     various real estate and construction projects.
3.   Prior to 2007, Dale St. Louis was for years
     engaged in land acquisition, development and
     construction. He has no formal education beyond
     high school graduation. To fund his business, he

1

would borrow money, mainly from Merrill Bank, in the form of construction loans on which he would pay interest only until construction was completed, whereupon the loan would convert to a fixed rate and period loan. These loans were either construction or residential and none were commercial loans. He estimated he closed twenty to twenty-five loans in accomplishing his business goals.

4. His wife, Theresa St. Louis, was joint owner of much of the real estate he acquired and would have been co-borrower on his numerous construction or real estate acquisition loans.

5. Until December 6, 2007, neither St. Louis had entered into a commercial loan or a loan that contained a prepayment penalty, although they had engaged in a significant number of loan transactions and closings (twenty to twenty-five). The Court infers and finds as a fact that Mr. and Mrs. St. Louis's practice, in borrowing money and at the loan closings, was to understand the terms of the loan transaction that were important to them, but not to read the documents they signed, including the note and mortgage, and not to have their own legal counsel, particularly when they were doing refinancing.

6. In 2007, Mr. Adamo, having solicited Mr. and Mrs. St. Louis as customers, worked on two occasions to get financing for them which he and they described as routine refinancing of existing loans similar to financing they had previously done, but at preferable terms, and not involving any prepayment penalty.

7. The nature of Mr. St. Louis's business was to buy and sell real estate and construct buildings on the real estate. Mr. and Mrs. St. Louis had acquired real estate in Hermon, Maine, on which Mr. St. Louis had built apartments. The land in Hermon contained two distinct lots on one deed and the lots were divided by deeds prepared by attorney Michael Griffin, principally so that Mr. St. Louis could borrow against them individually.

8. Mr. Adamo, as mortgage broker, facilitated routine financing for 1837 Hammond Street in Hermon, without any prepayment requirement. This was one of the two transactions he did in 2007, before December.

2

9. Mr. St. Louis was interested in getting financing for the remaining lot and buildings at 1833 Hammond Street in Hermon, which would permit him to net some cash, pay off the financing cost from rental income and permit the largest loan possible to consolidate some debt and make some business investments.

10. Mr. Adamo proposed several options, one of which was to get a lower interest rate but would involve a prepayment penalty. The Court finds that the Mr. and Mrs. St. Louis understood that a prepayment penalty would involve payment of a penalty of five percent of the unpaid balance if paid early, and this term was agreed to between Mr. St. Louis and Mr. Adamo before the loan closing on December 6, 2007. The prepayment fee was one of several terms agreed to that would constitute the loan contained in the "funding instructions," which the escrow agent went over with Mr. and Mrs. St. Louis in Mr. Adamo's presence. Mr. and Mrs. St. Louis' signed all of the documents they were presented on December 6, 2007, including the note. They did not read the note, which contained terms that were not what had been agreed to with Mr. Adamo and Northstar.

11. Mr. Adamo did not have a copy of the closing documents at the loan closing of December 6, 2007. He was never shown and did not look at the closing documents as they were signed by Mr. and Mrs. St. Louis. He denied there were any discussions with Mr. and Mrs. St. Louis regarding the terms contained in the "funding instructions", but did indicate that he and the closing agent discussed the prepayment terms in the note, which note the Court finds Mr. Adamo had neither seen nor read.

12. Mr. and Mrs. St. Louis were required to pay the prepayment fee as defined by the note they signed on December 6, 2007, in the amount of $100,473.67. By not having available the anticipated cash from this loan as a result of having to pay the unexpected prepayment penalty, plaintiffs incurred, over two years, in the amount of $11,269.

3

## Discussion

Pending before the Court are claims against Northstar for negligent misrepresentation, breach of contract and breach of fiduciary duty.[1]

### Contract

The Court finds that there was an agreement between Mr. Adamo and Northstar to obtain financing which included, among other terms, a prepayment penalty of five percent of the unpaid balance should payment be made early. The other terms were contained in the "funding instructions," (Pl.'s Ex. 46), which were agreed to by Mr. and Mrs. St. Louis, as confirmed at the time of closing.

While it is true that plaintiffs did not read the note they signed on December 6, 2007, by which they agreed to a significant prepayment penalty, that may define their agreement as between lender and borrower, but not their agreement with the mortgage broker, Mr. Adamo.[2]

Mr. Adamo and Northstar were providing services for a fee. The agreed-to service was to arrange for or facilitate a loan between Adamo's client and a lender under terms and conditions that the client/borrower found acceptable. To draw on the analogy from plaintiffs' trial brief, Mr. Adamo and Northstar were not "potted plants" in this transaction.

---

[1] The claims against the Wilkinson Law Offices, P.C., were for negligent misrepresentation. At the close of the plaintiffs' case, those claims were dismissed under a Motion made pursuant to M.R. Civ. P. 50(d) for failure to prove substantive elements of the claim, including that a misrepresentation was made. The Court relied on *Chapman v. Rideout*, 568 A.2d 829, 830 (Me. 1990), and *Perry v. H.O. Perry & Son Co.*, 1998 ME 131, ¶ 5, 711 A.2d 1303.

[2] The general rule continues to be that one who signs a contract or other written instrument without reading it is presumed to know its contents. *Bixler v. Wright*, 116 Me. 133, 134 (1917). In short, you are bound by what you sign, and not reading what you sign provides neither defense nor insulation. That Mr. and Mrs. St. Louis did not read what they signed and had no problem over the course of their twenty to twenty-five transactions is a function of blind fortune, not prudence or responsible business practices.

4

Mr. Adamo had agreed to provide a service in terms of a loan that met the conditions to which he and Mr. St. Louis had agreed. In that regard, the Court finds Mr. Adamo's testimony concerning the nature of that agreement or the conversations that took place at the December 6, 2007, closing to lack credibility, both substantively and the inconsistency of what he testified he knew and said at the closing. I find as a fact that the agreement between Adamo and St. Louis was as Mr. St. Louis testified and was as stated in the "funding instructions" (Pl.'s Ex. 46). *Forrest Assocs. v. Passamaquoddy Tribe*, 2000 ME 195, ¶ 9, 760 A.2d 1041. While on the one hand, Mr. and Mrs. St. Louis cannot avoid the conditions of the note they signed without reading, they had agreed to the terms of the loan to be obtained through Mr. Adamo and Northstar, and Mr. Adamo and Northstar breached their agreement. Plaintiffs are entitled to damages.

Negligent Misrepresentation

The tort of negligent misrepresentation requires that the offending party provides false information in a business setting that the victims justifiably rely on if the offending party fails to exercise reasonable care in obtaining or communicating the information. *Perry*, 1998 ME 13, ¶ 5, 711 A.2d 1303.

Notwithstanding his protestations when he testified, the Court is persuaded that Mr. Adamo took no meaningful action to advise Mr. and Mrs. St. Louis of the terms of the note either before or at the closing on December 6, 2007, as being inconsistent with those that they had requested and to which they had agreed. Likewise, Mr. Adamo made no effort to read and understand the terms of the note that he had facilitated for his clients in order to alert them to the inconsistency of the note and the terms upon which they had previously agreed with Mr. Adamo and Northstar. Having been through two closings with Mr. Adamo within the prior months, Mr. and Mrs. St. Louis were justified in relying on Mr. Adamo to act consistently with his representations and their agreement as to the full terms of the proposed note. Mr. Adamo made representations as to what the terms would be and made no effort through the closing to alert Mr. and Mrs. St. Louis that what they had agreed to was not what was before them. Northstar is liable to the plaintiffs for damages, being responsible for the tort of their agent and employee. *Legassie v. Bangor Publ'g Co.*, 1999 ME 180, ¶¶ 5-6, 741 A.2d 442.

5

Defendant Northstar is responsible to plaintiffs for damages.

## Breach of Fiduciary Duty

For there to be a breach of fiduciary duty, there must be a special relationship between the parties. *Bryan R. v. Watchtower Bible & Tract Soc'y, Inc.*, 1999 ME 144, ¶¶ 11-14, 738 A.2d 839. The relationship here between plaintiffs and Northstar is that of customer and salesman. Whether a defendant owes a duty of care to a plaintiff in the context of a fiduciary duty is a matter of law for the court. *Id.* In this instance, the Court is satisfied that the relationship of customer and salesman does not create a special relationship giving rise to a claim for breach of fiduciary duty. As to this count of the complaint, the Court finds for defendant Northstar.

## Damages

Because the damages for tort and contract are essentially the same here, the Court awards damages to the plaintiffs and against defendant Northstar in the amount of $86,873.67, plus collateral damages representing unexpected interest payment charges of $11,269.00. Plaintiffs are awarded total damages against defendant Northstar in the amount of $98,142.67, plus interest and costs.

September 27, 2011

Kevin M. Cuddy
Justice, Superior Court